Argument of the appellant, Mr. Gregory S. Matthews. Argument of the appellant, Robert T. O'Donnell. Are both sides ready to proceed? Actually, Your Honor, may it please the Court, my name is Robert Bush. I also signed in. And I'm here with Mr. Matthews. I'll be doing the primary argument on the case. Okay. I hope that's all right. Sure. I would also introduce Mayor Siler from the Town of Cortland, who is also in the audience. Justices, well, this case presents some interesting legal questions on contract formation, contract breach, and damages that were awarded but were not admittedly within the reasonable contemplation of the parties. This case is really about duress. And more specifically, whether the letter of one attorney sent to another attorney can, as a matter of law, constitute duress in a contract case. And you can dispose of this entire case by finding that there was no duress imposed on Eagle Homes as a result of Mr. Dimond's letter in February 2006. The language of the special service area documents that were signed and executed by Eagle Homes and the Town and the other developers cannot be more clear. The SSA agreement states in paragraph 2 that the Town developer and their successors in the sign have to hereby assign consent to the terms of this agreement and agree to be bound hereby for the term of this agreement. It specifically waives any rights Eagle Homes or Cortland may have had under the 2003 agreement, saying that this agreement supersedes and replaces any and all other agreements, including without limitation an agreement dated July 14, 2003, between the parties for the provision of utility service of Nature's Crossing and Cornerstone Square developments. The SSA closing certificate says that other than disclosed, the parties understand that the developer in no way is questioning the due formation and validity existence of the owner in any way questioning or affecting the validity of ancillary documents or the consummation of any transactions contemplated or any way questioning or contesting the validity of any governmental approval or anything that would materially, adversely affect the financial condition of the owner or the ability of the owner to participate in the property. Eagle Homes came to the Town voluntarily, signed the consents, which are dated before the date of Mr. Diamond's letter, January 2006, saying we want to participate in the special service area. We want the Town to do the special service area so we can have the 1.1 million gallon sewage treatment plant. These documents describe the fruition of months of intense negotiations amongst all the parties, including Eagle Homes. Eagle Homes knew in August 2005 that the old facility being contemplated, for which there was never a final financing, there was never a final agreement, there was never final scheduling, that that wasn't going to happen. And Eagle Homes at that point stopped work. All the work that they had done up to that point had been done voluntarily. It had never been done based on a formalized final agreement with dates set certain of when things were going to have to be done. That's under the 2003 agreement, right? That's correct. And we're not here to negotiate or to talk about whether or not that was complied with, correct? Is that your analysis? We're not talking about that's correct, that whether it was complied with. We question, number one, whether there was a contract at all. We question, number two, whether given the terms of that document, there was any breach by the town of that agreement. Well, why wouldn't there have been a contract? What was lacking when it was signed in 2003? Because there were some conditioned proceedings? Is that what you're referring to? That's right. Because the town had no obligation to do anything pursuant to that agreement. Unless the conditioned proceedings are met. Unless they are met, arguably there is a contract. That's right. But the conditioned proceedings were never met in this circumstance. And so there was no contract. There was certainly no breach because what Eagle Homes was negotiating for, in effect, the sewage treatment plant was completed and they had access to that facility. It was done under the 2006 agreement, which everyone agreed superseded the 2003 agreement. Briefly, what conditioned precedents were not met under the 2003 contract that prevented the formation of a contract that you're alluding to? The Schaefer system that was contemplated at that time in the 2004 agreement with Schaefer was never able to be financed, was never able to be started, was never able to be completed, so that the treatment that was necessary for Eagle Homes to do anything beyond 50 homes construction, that never came to fruition. And therefore, there was no trigger for the beginning of the 2003 contract. And whether there was or wasn't, that's irrelevant to what the duress, everybody agreed that there wasn't going to be enough capacity by what was being built. And so... What was Eagle's alternative? To which? To entering into the 2006 agreement. To entering into the 2006 agreement was to ensure that there was going to be sewage treatment... No, what was their alternative to not entering into that agreement? To not entering into the agreement, the special service area would likely have gone into effect anyway. They were still going to get what they had in effect wanted, and that was sewage treatment for the development that they were going to be... At the same cost? At the same cost... No, likely to be a different cost, but at a cost that was going to be real. There was no indication that anyone was going to be able to complete what was contemplated by the 2003 agreement. There was no testimony that there was any final financing offered to Schaefer. There was no... The final permits hadn't even been applied for with the ICC by Schaefer. Schaefer had told the town already that what we're building for you is going to be obsolete the date that we open it. Or at least within a year, as opposed to the originally contemplated 15 years. The jury found in favor of Eagle, correct? Yes. So, to summarize it, evidence is presented that the Village of Portland, through the attorney's letter, put Eagle in the position of either joining the SSA, correct? If I'm summarizing it wrong, tell me. Or suing them with limited financial relief. Those were the practical options of Eagle. Join the SSA under these terms, or sue with limited financial relief, knowing they've already invested large sums of money in the project. Why couldn't the jury find that to be duress? Why couldn't they find it to be duress? Well, because financial hardship, economic... If you look at the Krillick case, all of those conditions that you're talking about were items that were cited by the party claiming duress, and the Krillick court, this court, determined that none of those elements were constituted legal duress. This was not something where there was a few days, a few weeks even, of contemplation. Eagle knew in August of 2005 that they weren't going to be getting what they later said in their complaint is what they wanted, the 750-gallon facility. They had more than enough time to take whatever legal recourse they wanted to. They had an attorney. The town had an attorney. The developers had attorneys. As you said in the CBS Outdoors case, strong negotiation is not coercion, is not duress. It is just negotiation. And that's what happened here. You look at the emails between Eagle and the town, between Mr. Cronauer and Mr. Diamond, we will participate in the SSA. We want the SSA. All we want to make sure is that we don't do the SSA and have to pay a million dollars, which is what they thought was the only obligation they had under the 2003 agreement. This was not a matter of coercion. This was not a matter of duress. This was a matter similar to what goes on in economic developments in communities all the time, where the parties have one expectation of what's going to happen. They go along in the process. They find out that that's not going to work. And when they hit that wall, they move around, and they try and figure out a different way of doing this. And that's exactly what happened in this case. And Eagle Homes was at all the meetings. Eagle Homes was participating on all the emails. Eagle Homes said, let's do it. They signed the documents. They signed the releases. Just think what happens with how lawyers are going to deal with each other if you affirm this case. Lawyers don't send nice letters to other lawyers. Lawyers send letters that say, here is what's really strong about my argument, about the position of my client, and here's what's really bad about the position of your client. And your client isn't going to be able to go anywhere because my position is so much stronger than yours. But in many cases, isn't that done before a contract is entered into? Here, this happened after there was already ostensibly an existing contract. Well, there's an existing contract that everyone admitted didn't require Cortland to build anything at any time in any fashion. None. Mr. Cronauer agreed with that. Mr. Eagle Homes agreed with that. So that was a contract that was in agreement that I think set the stage for what the parties had hoped was going to happen. If Schaefer never builds a system, who's Eagle Homes going to say? I was just responding to your position of what you're saying. Look at the collateral consequences. Look at the precedent you'd be establishing. Generally, those strong letters you alluded to are done in the stages of negotiation. They don't usually come into effect after the parties have signed something. Condition proceeding notwithstanding. I don't think the lawyers are going to be shaking in their boots if the jury's verdict would be upheld, if that's what we decide to do. Well, I think if attorneys are sending letters to each other and they get their clients to sign releases, and then they march into court saying the release that my client signed was signed because your lawyer sent my lawyer a really bad letter, and I was afraid because your lawyer sent a bad lawyer to my letter. I signed the release. I signed the waiver. I gave up all my rights. I said that this is what it's going to be because that's what happened here is the party said we're not going to take what we had before. We agreed to take what we're going to get now, and we waive our rights under what we said before. If parties are going to be able to then say, and I did it because your lawyer sent a bad letter to my lawyer, then what impact, what effect is any release going to have on any party going forward? Well, the same effect that it's always had because otherwise, I mean, why is there a defense of duress? It's a question for the trier effect, is it not? Not in the circumstance where the duress claim is one letter by one lawyer to another lawyer. As a matter of law, that should have stopped this case at the very beginning. What makes you think that the finding that this was made based upon a sine qua non that just happened to be a lawyer letter as opposed to the totality of the facts and circumstances of which the letter may have been nothing more than a memorandum of the historical events that transpired? Well, the judge in a commentary on the motion for directed verdict said that he found that the only indication that duress existed could have been the letter that Mr. Diamond wrote. There was no other evidence in the trance. There was nothing that ever said that anyone from the town had ever told anyone at Eagle Homes that they had better do something or they had better watch out. The only evidence that the judge saw, that the party saw, that duress was imposed was the letter from Mr. Diamond. Well, doesn't the attorney always speak for his client? Are you saying Mr. Diamond was just sort of doing this on his own or was he speaking for the town court? He was representing the best interest of his client at the time. He was demonstrating to the other side what his... The position of his client. Exactly. And if lawyers can't do that without fear of if the other side takes an adverse position that claiming duress... There's no evidence in this case that Mr. Eagle Homes ever saw the letter. The letter went to Mr. Cronauer. You get letters all the time and you tell your client, we got a nasty letter from the other side. Who knows whether that's what happened here. If this case would not have existed but for Mr. Diamond's letter, this case should not exist. This case should not be able to be found in favor of Eagle Homes if the only thing that supported the case to begin with was Mr. Diamond's letter. And that's a duress that they cited in their complaint as the reason for why they should not be bound to all of the releases that they signed for the special service area documents. Was the letter a threat or was it a statement of fact? It was absolutely a statement of legal position and statement of fact giving alternatives. Mr. Cronauer testified that he recognized it as that. No one testified there was anything illegal in Mr. Diamond's letter or threatening anything illegal in Mr. Diamond's letter. The only... Well, I mean his alternatives were either join us or sue us. Well, that's and frankly that is generally how our system works. Fortunately, we are no longer in a position where the way in which disputes are resolved is you show up in the middle of Main Street at noon and figure it out that way. But this is not where Mr. Diamond's letter started the negotiations and which ended a couple weeks later. This was a position where Mr. Diamond, Mr. Diamond's letter was part of an entire process of negotiations started back in May 2005. But at least when Eagle Holmes knew that there was not going to be any more construction in August 2005, sending letters back and forth saying we're in on the SSA, we're in on the SSA. That all of the parties were responding and reacting and preparing other documents and setting up the financing based on all of the cooperation of all the parties. When the town approved the PUD, what impact did that have on the 2003 agreement? Given the 2006 agreement, it had no impact on the 2003 agreement. The 2003 agreement was null and void. At worst... That's your, that's your, that's it. I mean, there are no alternative arguments here. That release, that's all there is. That's correct. Okay. The only last thing I would say is there was absolutely no evidence whatsoever to support the damages award. If you're going to find in favor of Eagle Holmes, the damages in this case should be no more than $2,000 per home times 34 homes is $68,000. Everyone testified that the damages testified to by the plaintiff's expert at trial were totally unreasonable, were not contemplated by the parties when the 2003 agreement was signed. This is exactly like the Gillen case where the high seas that caused the damage to that barge were not contemplated by the parties when they created the agreement. The crash in the real estate economy was not contemplated by the parties at the time the 2003 agreement was reached. So that those delay damages were not part of the complaint, were not part of the contemplation of the parties, and should not have been considered by the jury in creating damages. Damages should be no more than $68,000. Thank you. Do you wish to offer a response? Yes, Your Honor. Your Honor, Robert O'Donnell on behalf of Eagle Holmes. Let me start by responding to your question, Justice Jorgensen. I would differ with counsel. I would say that the adoption of the final plan unit development in May of 2005 was a very significant event because it was the satisfaction of the condition preceded to the town's performance. That dovetails with one of your questions, Justice Hudson, and that is what were the conditions of the contract that needed to be satisfied? And those conditions, as it pertains to the town's performance, the condition preceded not to formation of the contract, but the condition preceded to the town's obligation to perform, was the adoption of the final PUD. The final PUD also really implicates the totality of the circumstances present in the alleged duress because in May of 2005, and again, to correct counsel, May of 2005 is six, eight months prior to Eagle Holmes signing the SSA documents. So the so-called release that's in the SSA documents is six months in the future. So at the time the town adopts the final PUD, the town adopts a planned unit development in favor of Eagle Holmes calling for the construction of over 500 units of various types, over 500 units, which will be served by a sanitary sewer system to be constructed by the town through Schaefer International to serve this development. Not only to serve that development, but to serve the residents of the existing town as well. So at that point, now at that same meeting, the same May 23rd, 2005 meeting where the final PUD is adopted, Schaefer International submits a written report and an oral report to the village to advise the village as to where it stood in the construction of the sanitary sewer system. The Schaefer agreement had been entered into with the town the prior year, April of 2004. So at this May 2005 meeting, the town first hears a report from Schaefer where Schaefer says they are on track with their IEPA permit. The IEPA permit is anticipated to be received sometime in July of that same year, 2005, and under that written agreement, there's 270 days or nine months for Schaefer to complete construction. Well, that happens to dovetail exactly with the final PUD being granted and EGLE's plan, which the town, which is contained within the PUD, for EGLE to begin delivering homes in the spring of 2006. So at what point then were all the condition proceedings, Council was alluding to, complied with under your interpretation? The adoption of the final PUD, because the final PUD is the town's commitment that this development can be built, which will be served by a sanitary sewer system that the town is building pursuant to its contract with Schaefer. Which obviously preceded the negotiations of the new agreement. Absolutely. The new agreement hadn't even, wasn't even, it may have been in the minds of other developers, but it wasn't in the minds of the village. Because in May of 2005, this was the first or second, Mayor Seiler couldn't recall whether it was the first or second meeting presided over by the new administration. Now, following that, the final adoption of the PUD is where, again, Mayor Seiler's words, not mine, where the other developers that were in line to be served by phase two of this plant began to, his words, dictate what was going to happen and a change in the paradigm, if you will. The change was from a 750,000-gallon system, phase one, which would serve the existing town and EGLE, to a 1.5-million-gallon system that would serve not only EGLE, the existing town, but all of the other developers that were waiting in line. That was the change that was affected by the new administration. That segues into, let me rephrase Council's argument, this letter that's been referred to, which I think is certainly an important part of the mix. He's saying, hey, look, the letter was simply a memorialization or a recitation of the, quote-unquote, I use the phrase, practical realities of the situation. So how is a letter from an attorney to the builder simply reciting the practical realities here become duress? He's saying it can't be duress. In context, first off, the letter was written after having been reviewed and approved by the mayor. So it was not a rogue attorney going off. Let's assume that it was on behalf of the mayor, simply relating, look, these are the practical realities of the situation. Like it or not, this is what we're all stuck with. But the so-called practical realities that Council gives short shrift to is the town had entered into a contract, a legal and binding contract, pursuant to which the town had begun to perform. How? They adopted the final PUD. After the final PUD is adopted, the town has its engineer on site supervising the installation of the project infrastructure. My client had invested, had in the ground, if you will, over $3 million worth of improvements. The most significant improvement, one of the most significant and expensive improvements, pursuant to the agreement, was the installation of the 18-inch sewer main that would connect the existing town to the new treatment plant. Because the written agreement, the 2003 agreement, had two conditions for my client, two primary conditions. Not only the payment of the million dollars, but also the installation on Eagle's property, at Eagle's expense, of this sewer connection to connect the existing town to the plant. That was installed. That's there today. So it wasn't simply Mr. Diamond advising my client of the practical realities. It was Mr. Diamond advising my client on behalf of the town that, listen, pal, if you don't agree to void the existing agreement and sign on to our new scheme, you're not going to get a sanitary sewer. He states that unequivocally. He doesn't simply say, well, no. He simply says, you're not going to get a sewer. In other words, the town is going to breach its agreement. And what you're going to be left with is having to go to your bank and explain why you're $3 million in the ground with no sanitary sewer, therefore no ability to sell and deliver homes, no ability to repay your lender, and you're going to be left with a lawsuit against an entity that's not going to be able to satisfy the judgment. And whether or not that's the rest should go to the trial effect. No question. And it did. But it did not just in the context of, as I say, a rogue letter from an attorney that comes in out of the blue. In light of all of the circumstances that were presented to the jury, most significant of which is where Eagle sat at that moment in time. Because in this instance, Eagle's vulnerability or not is very significant to whether or not there was duress. What option was Eagle left with? What were they going to lose if they didn't comply with this new agreement? At a minimum, well, if we didn't comply, we may be, as Mr. Diamond says, left without a sewer. And if we're left without a sewer, we have no ability to sell homes. So we're $3 million in the ground, a lot more committed to. The principles of Eagle had personally guaranteed all of this debt. They have no ability to repay the bank. They lose everything. No doubt about it, they lose everything. So in our brief, we mentioned some of the cases, I think both of which were decided by this court, where duress was allowed to be found in circumstances that I would submit are much less onerous than this one. The one that comes to mind is Raintree Homes versus the Village of Long Grove. In that instance, Raintree Homes was trying to recoup, was paying impact fees. And they were paying impact fees and did pay those fees over a several-year period. And the fees were found to be unlawful. But the Village of Long Grove defended by saying, well, but the fees were paid voluntarily over a seven-year period. And they were paid repeatedly. The developer kept coming back to the village and doing business, paying the fees year after year. The fees were paid voluntarily. The developer said, no, we were under duress. And the duress was either we pay that impact fee, unlawful as it was, or we can't do business in your town. And our customers want to do business in your town. And there was never any protest, by the way, filed at the time payment was made. But this court said under those circumstances where the developer is left without the ability to do business in the town without paying the fee really leaves that developer with no choice, or the only choice being go elsewhere. What are your response to Mr. Bush's statement that this would have a chilling effect on lawyers and their dealings with other lawyers? I guess, Your Honor. Maybe would it have a heating effect as opposed to a chilling effect? It certainly wouldn't have a chilling effect. Because if lawyers on behalf of clients are writing letters to others saying my client is going to breach the contract and has every intention of breaching the contract, and we know how vulnerable a position we've placed you in, but if you don't just void that contract and sign a renegotiated agreement, you're in trouble. The Schlossberg case. What happened in the Schlossberg case? One party was selling a property to another party. The property that was purchasing the property had an agreement to resell the property to flip it immediately upon purchase. The seller found out about that. The seller went back to his buyer and said, I want more money. Now, what's wrong with that? I want more money. I found out about the fact that you have deal number two. I want more money from you. The original buyer paid the more money. Then, after completing both transactions, sued his buyer, saying I only paid you that because you, in effect, extorted it from me. And the court said, yeah, that's duress. You were left with no alternative. You either pay the more money or you run the risk of breaching the contract to resell the property. I would submit to the court that this case presents a far more dramatic example of economic duress than does the Schlossberg case where that duress was found. How many contracts did Eagle have at the time of the February letter? By contract, do you mean contract to sell? To sell. I'm hesitating, Your Honor, because the testimony of Mr. Wisniewski was he had several, but by that time he had given the refunds back. In other words, he had accepted contracts and accepted deposits. But once construction stopped in late summer of 05, before the SSA documents, but when Schaefer stopped building the plant, then he realized his project was going to be delayed and he could not deliver on those contracts. So at that point in time, he began refunding deposits and canceling contracts. So when Your Honor asks me how many were still in place as of February of 06, I don't think very many. But that's not to suggest that there weren't very many. It's to state to the court, according to the evidence, that deposits had already been refunded and those contracts had canceled because they simply were not in a position of meeting the delivery dates. So to conclude, counsel mentioned the damages. I would simply point out that the damages evidence in this case, A, was unrebutted. There was no contrary evidence offered by the town by way of expert testimony or otherwise. And the damages evidence, I would submit, was very conservative, conservative in that we took into account the economic circumstances created by the collapse of the residential real estate market and did not seek any damages once that period began to run. And we took into account and factored into the damages the payment of the $1 million that EGLE would have paid had the contract not been breached. So the evidence was, I would submit, rather unassailable in that very conservative assumptions were made of the period of sale, the amount of units that would have been sold during that period, and the profit that would have been earned on each unit during the subject period. So the fact that all of the bases were touched, if you will, there was absolutely no contrary evidence offered by the town. The damages evidence, as accepted by the jury, was more than credible. If there are no further questions, I've concluded my argument, Your Honors. Thank you very much. Thank you. In the Krillick case, this court was faced with the question of whether to allow the defense of duress to be used as a sword in supporting, in fact, the damages case. This court refused to do that. The Raintree case doesn't even discuss the Krillick case, and that's because the Raintree case and the Schlossberg case don't depend on duress for the finding of a cause of action. Raintree was a challenge to the impact fees being charged by a community. The payment was made in order to avoid the voluntary payment doctrine. If those impact fees were found to have been appropriate, then the payment of the fees, whether under duress or not, would not have been repaid. So it was not a challenge, in effect, to the actions or the creation of a contract. It was merely a case that involved the appropriateness of the impact fee ordinance. Once the ordinance was found to be invalid, then by necessity, the plaintiffs had to be able to get back the money that they had paid. In the Schlossberg case, the court said whenever a person is compelled to make a payment of money, and in this case, there was no payment of money. That's why Krillick doesn't deal with the cases that involve Raintree. Raintree was after, but Schlossberg. When a person is compelled to make a payment of money, which the party demanding it has no right to receive and no adequate opportunity is afforded the payer to effectively resist such demand. That's not what we have here. Eagle Homes had months and months and months on how to deal with not even a payment of money. It was just the revision of an agreement on how to get their sewage treatment. And in fact, Schlossberg cites the case. Did you say it was a revision of an existing agreement? Of the terms under which the sewage treatment was going to be supplied to the developer. There was never any fruition of the development of the sewage treatment on which everything depended. The final PUD depended on there being approval of a final treatment plant. They couldn't have built more than 50 homes without additional sewage treatment. Counsel, you cite the Krillick as stating a proposition that a duress can only be used as a defense. Why is this not being used as a defense to the claim or the affirmative matter that you interposed that the newer contract applies? In which case the defense is, no, it doesn't apply because we are under duress to assign that and the older contract is still in effect. Because Eagle Homes has taken advantage of many of the conditions that were contained in the 2006 agreement. They negotiated a number of terms that weren't made available or weren't in the contracts with the other developers. That were different and apart from what was contained in the 2003 agreement. By accepting the terms and conditions of the 2006 agreement, you can't have it both ways. You can't have both cases. You can't only have a little bit of the 2006 case be wiped out. That being the part where you waive your claim to the 2003 agreement. You have to either accept that the 2006 agreement is null and void and you cannot do anything consistent with the 2006 agreement. You cannot accept any of the benefits of the 2006 agreement. Were those benefits in the nature of money? They were not in the nature of money. They were in the nature of having access to additional sewage treatment earlier than the other developers. I thought that was the reason for the original contract was they were supposed to be in on the ground floor first. I don't know how they couldn't. It seems strange to me that if they're putting in an 18-inch sewer pipe, why they would come in later than other developers. It would seem the inference would be that if they were doing this in compliance with the first contract, that the pipe that they're putting in on their own property would probably be used to benefit their own property first. The only obligation created under the first contract would have had to have started when there was sewage treatment provided, and there was never any indication that there was going to be sewage treatment reaching fruition with the town and Schaefer under the first agreement. If you go to the last portion of the Krillick case, it talks about the plaintiff arguing that Krillick's threat to breach the contract was coercive because Bongi would not have had a full and adequate judicial remedy. However, Bongi merely contends that it and another party faced financial collapse, bankruptcy, and protracted litigation if Krillick followed through on his threat. And this was a threat not to breach a contract involved in this transaction. It was a contract totally unrelated. We acknowledge Bongi's damages would have been substantial, but we disagree with Bongi that all the consequential and incidental damages of Krillick's threatened breach could not have been recovered through judicial proceedings. Moreover, Bongi cites no authority for its proposition that the inconvenience associated with an adversary's contract breach renders a judicial remedy inadequate. Because this party has enjoyed access to legal counsel during the three-month negotiation period, and because Bongi had an adequate potential judicial remedy, we conclude the trial court correctly dismissed the affirmative defense and correctly found that there was no duress. Thank you. Thank you very much. We are adjourned.